CARAZO, PLAINTIFF, AND APPPELLANT, *v.* CARAZO, DEFENDANT
AND APPELLEE.

APPEAL from the District Court of San Juan in an Action
for Divorce.

No. 2513.—Decided July 14, 1922.

DIVORCE—COUNTER-COMPLAINT—CRUEL TREATMENT—VARIANCE.—A district court
does not err in decreeing a divorce on a counter-complaint alleging cruel
treatment, although the evidence varies somewhat from the pleadings, if the
evidence is admitted without objection, is pertinent and shows acts which
determine the cruel treatment alleged as the fundamental ground for divorce.

The facts are stated in the opinion.
*Mr. J. J. Ortiz Alibrán* for the appellant.
*Mr. J. Martínez Dávila* for the appellee.

MR. CHIEF JUSTICE DEL TORO delivered the opinion of
the court.

Teofilo Carazo brought an action for divorce against his
wife, Andrea Guzmán Carazo. The defendant denied the
allegations of the complaint against her and filed a counter-
complaint praying for a decree of divorce.

The third and fourth counts of the counter-complaint are
as follows:

"That during the last year that the defendant and counter-
plaintiff and the plaintiff and counter-defendant liver under the
same roof, on several occasions and almost daily the latter insulted
and abused the defendant and counter-plaintiff by charging her

with being shameless, abandoned, indecent, filthy, etc., and on the 17th of March, 1919, ·he struck her in the face publicly, creating a great scandal in which the police had to intervene.

"That the conduct of the plaintiff and counter-defendant has seriously injured the health of the defendant and counter-plaintiff by causing her nervous prostration."

After a trial of the case the court dismissed the complaint, sustained the ·counter-complaint and decreed the dissolution of the matrimonial ties between the parties, giving to the mother the *patria potestas* over the children. The plaintiff took the present appeal and the errors assigned refer to the weighing of the evidence.

We have considered carefully the evidence examined and all of the Justices of the Court agree that it is insufficient to support the complaint. As to whether or not it is sufficient to sustain the counter-complaint, the opinion was divided, but the majority decided in the affirmative.

In the counts of the counter-complaint quoted it is averred that the plaintiff insulted and abused the defendant by addressing to her the epithets therein stated, and it is alleged also that she was the victim of a specific instance of abuse on March 17, 1919. Furthermore, the defendant alleges that she suffered nervous prostration and that her health has been impaired as a result of the plaintiff's conduct.

The testimony of the defendant covers fifteen pages of the record. It presents a gloomy picture. Her testimony was admitted without objection. "Our life," she said, "during those four years was terrible, because he never liked my children. From the time that I became pregnant I suffered horribly because he did not want me to bear any children. I had to take abortifacients in order to please him." She continued also without objection as follows: "The trouble was about the oldest girl * * *. Sometimes he would come home while I was in the kitchen preparing the luncheon and would catch the child and tie her hands and hang her by them

from the cot. At other times he would lay her on the floor
and then when I came in I would find her almost strangled.
I could see the marks of his fingers where he had gripped her
with his hands; sometimes on her head. * * * . When I
found he had done this it made me cry, and I asked him how
he could do that and he would reply: 'I do not want to in
crease the population of the world. I want you only and do
not want any children.' ''

The occurrence referred to in the counter-complaint took
place on the 17th of March and was described by Andrea
Guzmán Carazo as follows:

"That quarrel was because he said to me that morning that I
must leave the house. I replied that I could not leave the house
and he said that he had found a house for me, to which I replied
that I could not move from this house because I bought it to live
in. He then said that I must be out of the house before night.
I replied that I could not leave the house because it belonged to
me. Then he went to see Julio Vélez from whom he rented a house.
He came back and said: 'Now you have a house.' I replied: 'No,
I bought this house and I shall live in it.' Thereupon he said:
'Then I will give you no money today.' Then I went out to speak
to the matron who had ordered him to give me a certain amount
of money every day. I called the matron on the telephone and
said to her that Carazo had stopped my daily allowance. The
matron replied: 'Tell Carazo to come to the telephone.' When I
was going back to the house I found Carazo dragging the girl along
the street. When I saw this I took hold of the girl and asked him
where he was taking her. The girl was screaming because she
does not love him. He said to her: 'Come with me,' and she
replied: 'No, this is my mother.' I took the girl to the house and
saw that she was greatly bruised, so much so that I had to bring
her to San Juan. Then I went in the house and put on a gown
and went to see the chief of police and asked him to come to the
house. When the chief arrived he wanted to take the girl from me
and he pulled her one way and I pulled her towards me. He did
not obey the orders of the chief and then the people began to yell.
His mother came and he again pulled the girl whom the chief was

holding. Then came a brother of his who caught me by the hair, and his brother's wife came also and struck me, and they all struck me.

"What did he do to you during that quarrel?

"He dragged me by the hair. Besides, I have some bruises here. Julio Vélez came to my rescue."

## With regard to other acts she said:

"He came from the school at about half past eleven and I went to serve his luncheon as usual. When I heard the baby crying I ran upstairs and found it tied to a leg of the wardrobe with a stocking. The baby was then only about seven months old and finding it in that position necessarily made me angry.

"When you arrived what happened?

"When I began to unfasten the baby he kicked me from behind and I fell against the baby.

"How many times did he strike you?

"Every time we quarreled. I could show where he bit me. He also took me by the hair and beat me.

"Did he support you and the girl?

"While he was at home?

"Yes.

"Sometimes he stopped my daily allowance at Sosa's store and they had to send me some food from my home.

"What was the reason why you spoke to the matron?

"Afterwards he began to behave as formerly and his manners were excellent when he was in the house, and he would say nice things to me. One day I went with him to his desk and while cleaning it as usual I found a letter from a girl.

"PLAINTIFF.—I object to her testifying as to the letter, for the letter is the best evidence.

"JUDGE.—She can not testify to the contents of the letter."

In connection with the insulting language to which the counter-complaint refers, Andrea Carazo did not testify specifically, but said only that during their repeated quarrels he called her "terrible names."

Referring to a certain letter the wife said:

"I found a letter with a portrait and a post-card and when he

arrived at noon I said to him: 'Carazo, look at this evidence; what does it means?' And he replied: 'That is nothing of importance; she will be my wife when we have been divorced.' I then began to cry and he said: 'Cry bitterly, I am going to divorce you in order that I may marry her.' "

The matron of the school knew of this occurrence, which was the cause of further quarreling.

It is contended that the specific act alleged in the complaint was not proved. Perhaps it was not shown positively that it was the plaintiff who struck the defendant in the face publicly on the day mentioned, but the scandal which took place on that day was proved with an abundance of details. The defendant was publicly attacked by the plaintiff and his family, a brother of the plaintiff having caught hold of her by the hair. The plaintiff participated in the affair and is responsible for it.

The variance between the allegations and the evidence is not substantial. The act was essentially the same. The variance was only in the details regarding the manner in which it was done. So deep was the impression produced upon one of the spectators, Asunción Román, by the "abuse of a poor and unhappy woman" that of his own will and for fear that "they would keep the affair secret" he came to San Juan to ask the aid of the district attorney, according to his own testimony at the trial.

The record also shows that Domingo Sosa testified, without objection by the plaintiff, as follows:

"Were you friendly with him?

"Yes, they had an account at the store?

"Do you know anything about their home life; whether they lived peaceably and happily or whether they quarreled constantly?

"For some time I saw nothing, until one day they had a fierce quarrel and closed the door. Then I heard them quarreling and went out of the store and broke the door open and found them fighting and the girl crying and I asked: 'What is the matter?'

He immediately released her and went out. She said: 'He wanted to kill my daughter.' Then I went back to my store.''

The evidence should agree with the allegations. That is the rule. But when pertinent evidence is offered and admitted without objection, the court may give it some weight. In his brief the appellant raised no question of variance between the pleadings and the evidence, but the matter was discussed by the members of the court and it seems proper to state that the conclusion of the majority rests upon the decision in the case of *Ellinghonsen* v. *Ajax Live Stock Co.,* 51 Mont. 275, and the elaborate note to that case published in L. R. A. 1916 D, 841.

Being convinced that the judgment was just and according to law, we think that is should be

*Affirmed.*

Justices Aldrey, Hutchison and Franco Soto concurred.
Mr. Justice Wolf dissented.